**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PATRICIA ANN BENTLEY,** | : | **CIVIL ACTION NO. 1:07-CV-0889** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **ALLBRITTON COMMUNICATIONS** | : | |
| **COMPANY, HARRISBURG** | : | |
| **TELEVISION, INC., and WHTM-TV,** | : | |
| **INC., d/b/a WHTM-TV, ABC-27,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

This is an employment discrimination action brought by plaintiff Patricia

Ann Bentley ("Bentley") against her former employer, defendant Harrisburg

Television, Incorporated ("Harrisburg TV"), and its corporate parent, defendant

Allbritton Communications Company ("Allbritton").  Bentley contends that

defendants fostered a religiously hostile work environment, discriminated against

her on the basis of religion and gender, and retaliated against her in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and the

Pennsylvania Human Relations Act ("PHRA"), 43 PA. CONS. STAT. §§ 951-963.[1]

Additionally, Bentley claims that defendants discriminated against her with respect

to her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29

---

[1] Bentley also raises claims under 42 U.S.C. § 1988, which governs the award of attorney's fees in civil rights proceedings.  The court declines to consider the merits of the § 1988 claim at this time.

U.S.C. §§ 621-634.  Presently before the court is defendants' motion for summary

judgment (Doc. 15).  For the reasons that follow, the motion will be granted.

I.   **Statement of Facts**[2]

Patricia Bentley is a fifty-eight-year-old female who self-identifies herself as a

Christian.  (See Doc. 1 ¶ 79; Doc. 17, Tab A at 8; Doc. 29 ¶ 1.)  From September 1999

to September 2005, Bentley worked as a Senior Account Executive for Harrisburg

TV.  (See Doc. 17, Tab B at Ex. 6; Doc. 29 ¶ 5; Doc. 30 at PD483-85, PD565-66.)

Bentley was essentially an advertising sales representative, and her primary duties

consisted of servicing Harrisburg TV's existing advertising accounts and generating

new accounts.  (See Doc. 16 ¶ 5; Doc. 29 ¶ 5.)  Harrisburg TV is a network-affiliated

local television station owned and operated by Washington, D.C.-based Allbritton.[3]

(See Doc. 30 at PD1.)

A.   **Bentley's Pre-2005 Employment**

When Bentley was initially hired in September 1999, she worked from her

home in York, Pennsylvania.  (Doc. 16 ¶ 8; Doc. 29 ¶ 8.)  At some point thereafter,

Harrisburg TV acquired office space in York, and Bentley began to use that space

---

[2] In accordance with the standard of review for a motion for summary judgment, the court will present the contested facts in the light most favorable to the plaintiff, who is the non-moving party.  See infra Part II.

[3] Bentley has named WHTM-TV, ABC-27 as a defendant in this case.  (See Doc. 1.)  The record demonstrates that WHTM-TV, ABC-27 is not a corporate entity, but merely a Federal Communications Commission license designation. (See Doc. 6.)  WHTM-TV, ABC-27 is not an "employer" as that term is defined by Title VII, see 42 U.S.C. § 2000e(b), the PHRA, see 42 Cons. Stat. § 954(b), and the ADEA, see 29 U.S.C. § 630(b). Hence, it is not a proper defendant in this matter.

as her primary office.  (<u>See</u> Doc. 16 ¶ 8; Doc. 29 ¶ 8.)  During this period of time,

Bentley made infrequent visits to Harrisburg TV's headquarters in the city of

Harrisburg to attend sales meetings, client calls, or to consult with her supervisors.

(<u>See</u> Doc. 17, Tab A at 164-66; Tab C at 51.)

      In January 2003, Harrisburg TV hired Larry Maloney ("Maloney") as local

sales manager, and he became Bentley's direct supervisor.  (Doc. 16 ¶ 11; Doc. 29

¶ 11.)  Maloney apparently employed crude language to express himself in the

workplace.  (<u>See</u> Doc. 17, Tab A at 95, 247.)  Despite her limited exposure to the

Harrisburg office, on several occasions Bentley heard Maloney saying things like,

"Goddamn," "Goddamnit," or "Jesus Christ."  (<u>Id.</u> at 202.)  Maloney uttered these

phrases in conversations with Bentley, as well as other account executives.  (<u>See</u> <u>id.</u>

at 145-46.)  Prior to late 2004, there is no evidence that Bentley ever complained

about Maloney's language, nor did she ever voice any religiously-based discomfort

associated with Maloney's language.[4]  (See Doc. 17, Tab C at 50-51; Tab E at 9-10.)

### B.    Permanent Relocation to Harrisburg

In December 2004, Bentley was notified that she would no longer be

permitted to work out of the York office and instead was required to begin and

conclude each working day at the Harrisburg office location.[5]  (See Doc. 16 ¶ 9; Doc.

29 ¶ 9.)  Around the same time that this transfer took effect, Bentley initiated a

---

[4] Although Bentley avers in her pleadings that she complained about
Maloney's language prior to late 2004, that assertion is unsupported by the record.
No evidence of any such complaints is contained in the employment files or exhibits
submitted to the court; no Harrisburg TV employee recalls Bentley lodging any
complaints prior to January 2005, (see, e.g., Doc. 17, Tab C at 50-51; Tab E at 9-10);
and even Bentley admits that it was not until December 2004 that she first "did
more than make a casual mention to [Maloney] of [her] strong objection" to his
language, (see Doc. 28 ¶ 3).  Thus, absent any record evidence to the contrary, the
court finds that Bentley made no complaints prior to late 2004 regarding offensive
language in the workplace.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 n.20
(1970) (rejecting the notion that a party opposing summary judgment may
successfully create a dispute of material fact simply by relying on a contrary
allegation in briefing papers); see also FED. R. CIV. P. 56 advisory committee's note
on 1963 amendment to subdivision (e) (same).  To the extent that Bentley's
summary judgment affidavit seeks to controvert this conclusion, the court
disregards the affidavit.  See Martin v. Merrell Dow Pharm., Inc., 851 F.2d 703, 706
(3d Cir. 1988) (authorizing the district court to disregard a party's affidavit when it
contradicts prior testimony and that party provides no satisfactory explanation for
the contradiction).

[5] Bentley does not claim that this transfer was retaliatory or discriminatory.
Rather, management informed Bentley that the new requirement was intended to
increase her sales productivity by forcing her to spend more time in the Harrisburg
market, and also to allow Maloney to more efficiently supervise Bentley's daily
activities.  (See Doc. 17, Tab A at 197-200; Tab F at 27-28.)  While Bentley questions
the underlying business judgment of the decision, she does not question the
veracity of management's explanation.  (See Doc. 29 ¶ 9.)

conversation with Maloney in which she expressed her objections to his use of offensive language. (Doc. 28 ¶¶ 3-4.) Specifically, Bentley explained to Maloney that her religious beliefs prohibited "taking the Lord's name in vain," and she objected to his casually doing so. (See id.) She indicated that she found the behavior very upsetting and requested that it cease. (Id.)

In Bentley's view, the atmosphere in the office did not improve, prompting her to seek out and complain to higher management. Bentley voiced her concerns in January 2005 to Harrisburg TV's general manager, Joe Lewin ("Lewin"), as well as director of human resources Sharon Chambers-Basehore ("Chambers-Basehore"). (Doc. 17, Tab A at 248-52; Tab D at 29-30; Tab E at 9-10.) At this time, Bentley complained about the language used not only by Maloney, but also by two other employees, Nikki Bender ("Bender") and Sherry Buonopane ("Buonopane").[6] (Doc. 16 ¶ 12; Doc. 17, Tab A at 250; Doc. 29 ¶ 12.) Bentley informed Lewin: "I am a Christian, [and] I've had problems with this continuous using [sic] the Lord's name in vein [sic]."[7] (Doc. 17, Tab A at 249.) Both Lewin and Chambers-Basehore assured Bentley corrective action would be taken promptly. (See id. at 250; Tab D at 29-30.)

---

[6] Bender and Buonopane were employed as traffic managers and had no supervisory authority over Bentley. (See Doc. 1 ¶¶ 20-21.)

[7] Bentley indicated to both Lewin and Chambers-Basehore that she particularly objected to the use of the words, "God," "Goddamn," and "Jesus Christ." (See Doc. 16 ¶ 12; Doc. 17, Tab A at 247-52; Tab D at 29-30; Doc. 29 ¶ 12.) Bentley described such language as "blasphemy" and objected to its use because of her "strong religious beliefs." (Doc. 17, Tab D at 29.)

5

The day after Bentley's complaint, Lewin issued an interoffice memorandum reminding all employees to abstain from using offensive language. (Doc. 17, Tab C at Ex. 2.) Additionally, Lewin and Chambers-Basehore advised each of the station department heads to monitor the language used by their respective staff. (See Doc. 17, Tab D at 30.) Finally, Lewin and general sales manager Rob Saylor ("Saylor") issued personalized memoranda to Maloney, Bender, and Buonopane, admonishing them to "refrain from using . . . language that may be offensive to others." (See Doc. 17, Tab B at Ex. 20; Doc. 30 at PD791-92.)

## C.  Bentley's Employment Conditions, Post-January 2005

In spite of Lewin and Chambers-Basehore's efforts, Maloney, Bender, and Buonopane continued to use language that Bentley found offensive. (Doc. 17, Tab A at 258.) Moreover, Bentley alleges that the workplace atmosphere changed markedly after her complaint. Co-workers gave Bentley "attitude"; some refused to speak with her, sign her birthday card, or share in her birthday cake; and when Bentley requested assistance with a work-related endeavor, her co-workers responded sarcastically. (Id. at 262-63, 271.) In short, Bentley began to feel isolated in her work environment.[8] (Id. at 262.)

Subsequent to her January 2005 complaint, Bentley claims that Harrisburg TV's management also began to treat her differently. According to Bentley, her work was "hyper scrutinized" and "so-called rules and standards on everything

---

[8] Bentley admits that there is no indication management was directing her co-workers to act in this fashion. (See Doc. 17, Tab A at 271.)

6

from my mode of dress to handling routine appointments and personal standards (morals) was questioned."  (Doc. 28 ¶¶ 7, 13.)  Bentley recounts several specific instances of what she considers discriminatory and retaliatory scrutiny by management.  The court will briefly describe each of the instances that comprise Bentley's complaint.

Shortly after her January 2005 meetings with Lewin and Chambers-Basehore, Bentley was told to cease designating herself as a "senior account executive" on her business correspondence.  (Doc. 29 ¶ 5.)  Bentley admits that she was never given permission to characterize herself this way.  (Doc. 17, Tab A at 302.)  According to Harrisburg TV, Bentley's proper title was simply "account executive," and there were no sales employees authorized to use the title, "senior account executive."[9]  (See Doc. 17, Tab C at 181-82.)  Although her title was altered, Bentley's pay was not reduced, nor were her duties or responsibilities changed; functionally, her position remained the same.  At least one additional employee also referred to herself as a "senior account executive," but it is unclear whether management told this individual to stop using the designation.  (See Doc. 17, Tab A at 302-03.)

In March 2005, Maloney sent Bentley a memorandum reiterating that office policy required her to begin and end each work day in the Harrisburg offices unless

---

[9] General sales manager Saylor testified that Harrisburg TV had never designated any employee as a "senior account executive."  (Doc. 17, Tab C at 181.)

she received prior approval to do otherwise.[10] (Doc. 17, Tab B at Ex. 4.)  In the event that Bentley would be absent from the office, she was reminded that she was to document that fact on the company's sign in/sign out sheet.  (See Doc. 17, Tab E at 20-21; Tab F at 74-76.)  Each of Harrisburg TV's account executives was required to adhere to this "sign in/sign out" policy.  (See Doc 16 ¶ 15; Doc. 17, Tab E at 21; see also Doc. 17, Tab A at 121; Tab B at Ex. 34; Doc. 29 ¶ 15.)  Maloney required Bentley to sign the March 2005 memorandum acknowledging that she understood the "sign in/sign out" policy.  (See Doc. 17, Tab B at Ex. 4.)  Bentley alleges that no other employee was forced to physically sign such an acknowledgment, (see Doc. 28 ¶¶ 14A-B), though she concedes that the policy was applicable to all Harrisburg TV account executives, (see Doc. 17, Tab A at 121; Doc. 29 ¶ 15).  Bentley was reprimanded by Saylor once in May 2005 for disobeying the "sign in/sign out" policy, (Doc. 17, Tab B at Ex. 28), and once again in August 2005, (Id. at Ex. 31).

Soon after Maloney required her to provide written acknowledgment of the "sign in/sign out" memorandum, Bentley lodged a complaint with Lewin, alleging "continuing retaliation" and "age discrimination."[11]  (Doc. 30 at PD216-19.)  The complaint indicated that Maloney's behavior—not only his continued offensive language, but also the scrutiny that he applied to Bentley's actions—was causing Bentley "great difficulty, anxiety, and concern."  (Id. at PD216.)  This complaint

---

[10] It is not clear from the record what prompted Maloney to send Bentley this reminder memorandum.

[11] Bentley lodged this complaint through her attorney.  (Doc. 30 at PD216-19.)

precipitated the involvement of Allbritton's deputy general counsel.  (See id. at PD220.)  In May 2005, Maloney's supervision of Bentley was terminated and general sales manager Saylor was assigned to supervise her.  (Doc. 17, Tab A at 102.) Bentley admits that her work situation improved after this reassignment.  (See id.)

In April 2005, Pivec Advertising, which was one of Harrisburg TV's largest clients, requested that Bentley be removed as the manager of its account.  (Doc. 17, Tab B at Ex. 27.)  Concerned that transferring her off the account would adversely impact upon Bentley's salary, Saylor refused to remove her as requested.  (Doc. 17, Tab C at 133.)  Pivec responded by withholding all advertising purchases with the station, and expressed to Saylor their absolute refusal to work with Bentley.  (Id. at 134.)  At this point, Saylor removed Bentley from the account, but allowed her to continue collecting commission from the account revenue.  (Id.)

On two occasions between May 2005 and August 2005, Bentley was reprimanded for wearing "unprofessional" work attire.  (Doc. 17, Tab B at Ex. 30; Tab D at D909.)  Bentley claims that the clothing for which she was reprimanded was no different than that which she had worn during her previous five years with the station.  (Doc. 17, Tab A at 337-38.)  Harrisburg TV's guidelines for proper work attire applied to all employees, (see Doc. 17, Tab B at Ex. 24), and at least one other account executive was reprimanded on multiple occasions during this time period for her work attire, (see Doc. 17, Tab D at 76).

In May 2005, Harrisburg TV offered to send its account executives, along with a guest of their choice, on an all-expenses paid ocean cruise.  (See Doc. 17, Tab

C at 119; Tab F at 68.)  Bentley elected to go with her boyfriend.  (Doc. 17, Tab A at 304.)  Prior to the cruise date, Bentley was summoned to Saylor's office and Saylor began questioning the propriety of Bentley sharing a room on the cruise boat with someone to whom she was not married.  (Doc. 17, Tab A at 304-05; Tab C at 120.)  Saylor did not pose similar questions to the other unmarried attendees bringing significant others.  (Doc. 17, Tab A at 305-06; Tab C at 121.)

Finally, on September 7, 2005, Bentley tendered her resignation to Harrisburg TV's management.  In her letter, Bentley stated that she had been "compelled to resign because of the ongoing discrimination, retaliation, isolation, harassment, stress and hostile working environment."  (Doc. 17, Tab B at Ex. 1.)  Prior to the submission of this letter, Bentley secured an offer of employment with Citizen's Bank.  (See Doc. 17, Tab A at 46-47.)

### D.   Administrative Proceedings and Bentley's Complaint

Before departing from Harrisburg TV, Bentley filed charges with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"), contending that she was the subject of religious discrimination, age discrimination, harassment, and retaliation.[12]  (See Doc. 1 ¶ 11.)  Bentley received a dismissal from the EEOC on February 19, 2007, along with a notification of her right to file suit within ninety days.  (Id. ¶ 13.)  Bentley commenced the instant action on May 16, 2007, pursuant to Title VII of the Civil

---

[12] In October 2005, Bentley amended this filing to allege that she was constructively discharged.  (See Doc. 1 ¶ 12.)

Rights Act, the PHRA, and the ADEA.  (Id. ¶ 1.)  Specifically, Bentley contends that Harrisburg TV fostered a workplace hostile to her religion; that she suffered discrimination on the basis of her religion, gender, and age; and that she suffered retaliation after complaining to management about what she believed to be offensive language in the workplace.  Defendants filed a motion for summary judgment on March 5, 2008, asserting that Bentley failed to produce adequate evidence to support her claims.[13]  (See Doc. 15.)  The parties have fully briefed the motion and it is ripe for disposition.

## II.   <u>Standard of Review</u>

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(c).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-

---

[13] Defendants also claim that Allbritton is entitled to summary judgment on each of Bentley's claims because Allbritton was not Bentley's employer and cannot be liable for Harrisburg TV's actions.  (See Doc. 17 at 23-25.)  Given the court's grant of summary judgment on each of the underlying employment discrimination claims, resolution of Allbritton's claim contesting its status as Bentley's employer is unnecessary to the disposition of the case.

57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89

(1986); see also Fed. R. Civ. P. 56(c), (e).  Only if this threshold is met may the cause

of action proceed.  Pappas, 331 F. Supp. 2d at 315.

## III.   Discussion

Title VII of the Civil Rights Act makes it unlawful for an employer "to

discriminate against any individual with respect to compensation, terms,

conditions, or privileges of employment, because of such individual's race, color,

religion, sex, or national origin."[14]  42 U.S.C. § 2000e-2(a)(1).  In both discrimination

and retaliation cases, proof at the summary judgment stage adheres to the well-

established McDonnell Douglas burden-shifting approach.  See McDonnell Douglas

Corp. v. Green, 411 U.S. 792 (1973).  McDonnell Douglas requires Title VII plaintiffs

to establish a prima facie case of discrimination, to wit: that (1) the plaintiff was a

member of a protected class, (2) that he or she suffered an adverse employment

action, and (3) that nonmembers of the protected class received more favorable

treatment.  See id. at 802; see also Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S.

248, 253-54 (1981) (elaborating on McDonnell Douglas framework).  Once a plaintiff

satisfies the prima facie requirements, the burden of production shifts to the

defendant, who must rebut the inference of wrongdoing with evidence of a

---

[14] The analysis of both discrimination and retaliation claims under Title VII and the PHRA is identical.  Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007) (discussing the similarity of Title VII and PHRA retaliation analysis); Weston v. Pennsylvania, 251 F.3d 420, 425 n.3 (3d Cir. 2001) (discussing the similarity of Title VII and PHRA discrimination analysis).

12

legitimate, non-discriminatory or non-retaliatory purpose for the action in question. McDonnell Douglas, 411 U.S. at 802-03; see also Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 199 (3d Cir. 1996).

If the defendant is successful in producing such evidence, the burden shifts back to the plaintiff, who must then "produce evidence sufficient to persuade the factfinder by a preponderance of the evidence that the employer nevertheless harbored a discriminatory intent." Delli Santi, 88 F.3d at 199. Essentially, the plaintiff must show that the defendant's proffered reasons for the actions taken are merely pretext or cover-up, masking the defendant's true discriminatory intent. See Weston v. Pennsylvania, 251 F.3d 420, 432 (3d Cir. 2001); Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). Thus, the ultimate burden to prove discrimination on the basis of the protected class remains with the plaintiff at all times. See Barber v. CSX Distrib. Servs., 68 F.3d 694, 698 (3d Cir. 1995).

In the instant matter, Bentley claims that she was subjected to a hostile work environment on the basis of her religion. Additionally, she alleges that Harrisburg TV subjected her to discrimination on the basis of religion, gender, and age. Finally, Bentley claims that she was the victim of retaliatory measures after complaining about what she perceived to be a hostile work environment. The court will address these claims *seriatim*.

A.     **Hostile Work Environment**

Bentley contends that the frequent use of what she considered religiously offensive language amounted to a hostile work environment. Specifically, Bentley

13

points to Maloney, Bender, and Buonopane's repeated utterance of words such as

"God," "Goddamn it," and "Jesus Christ," which Bentley regarded as

"blasphemous," unsettling, and uncomfortable.  (See Doc. 1 ¶¶ 25, 28.)  In December

2004, Bentley specifically voiced her objection to such vocabulary.  Even after

complaining to Lewin and Chambers-Basehore, however, the foul language

continued.

Claims asserting a religiously hostile work environment are not nearly as

common as those alleging a workplace hostile to one's age, gender, or race.  See 3

LEX K. LARSON, EMPLOYMENT DISCRIMINATION § 55.05 (2d ed. 2008).  Nonetheless,

Title VII makes it unlawful for an employer to tolerate anti-religious workplace

behavior that "unreasonably interferes with a person's performance or creates an

intimidating, hostile, or offensive working environment."  Weston, 251 F.3d at 426-

27 (quoting Meritor Savs. Bank FSB v. Vinson, 477 U.S. 57, 65 (1986)).  In order to

establish a prima facie case for hostile work environment on the basis of religion, a

plaintiff must show evidence sufficient to demonstrate each of the following: (1) the

employee suffered intentional discrimination because of religion; (2) the

discrimination was pervasive and regular; (3) the discrimination detrimentally

affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable

person of the same religion in that position; and (5) the existence of *respondeat*

*superior* liability.  Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 276-77

(3d Cir. 2001); Hodson v. Alpine Manor, Inc., 512 F. Supp. 2d 373, 387 (W.D. Pa.

2007).  A court attempting to determine whether the plaintiff has satisfactorily

14

proven each factor must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993); see also Caver v. City of Trenton, 420 F.3d 243, 262-63 (3d Cir. 2005).

Satisfaction of the first prong of the inquiry focuses upon causation, necessitating a showing that the religiously offensive behavior occurred because of the plaintiff's religious beliefs. Abramson, 260 F.3d at 277; see also Spain v. Gallegos, 26 F.3d 439, 448 (3d Cir. 1994) (discussing the causation factor in a sex discrimination suit). The plaintiff must demonstrate that the alleged conduct was not "merely tinged" with religiously offensive remarks, but actually constituted discrimination *because of* her religion. See Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81 (1998) (explaining the standard in the context of a sex discrimination suit); see also Rivera v. P.R. Aqueduct & Sewers Auth., 331 F.3d 183, 189-90 (1st Cir. 2003) (discussing the standard in a religiously hostile workplace suit). Because it is often difficult to discern discriminatory animus, the required showing does not depend upon direct proof of the perpetrator's intent. See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1082 (3d Cir. 1996). Instead, when conduct by its very nature permeates the workplace with intimidation, ridicule, and insult, an inference of discrimination arises simply by showing that the conduct occurred. See Harris, 510 U.S. at 21; Abramson, 260 F.3d at 278-79.

15

Bentley presents evidence that language was used in the Harrisburg TV offices which she, as a Christian, found religiously offensive.  Conspicuously absent from the extensive record, however, is any evidence of causation.  The question for the court is not whether a Christian would find the language offensive; it is whether Bentley's religious beliefs prompted its use.  See Abramson, 260 F.3d at 277-78 (distinguishing direct proof of discriminatory animus, which is not required at the summary judgment stage, from evidence showing that plaintiff's treatment "was attributable to her religious faith and practice," which is required to survive summary judgment).  Bentley fails to present one shred of evidence that any of the language in question was used *because of* her religious faith.  In fact, Bentley admits that Maloney commonly used words like "God," Goddamn it," or "Jesus Christ" long before she voiced her objections to him in December 2004.  Moreover, Bentley concedes that this language was part of Maloney, Bender, and Buonopane's everyday vernacular, (see Doc. 17, Tab A at 247), that they used such vocabulary

with everyone,[15] (see id.), and that its use was often a reaction to workplace stress, (see id. at 258 ("Anytime they were mad or whatever, the words came flying out of their mouths again.")).

The language identified as "blasphemous" by Bentley does not reference Bentley's religion, nor has she shown that Maloney, Bender, and Buonopane intended to mock or insult her religion by so speaking.  As other courts have recognized, there is "a conceptual gap between an environment that is offensive to a person of strong religious sensibilities and an environment that is offensive because of hostility to the religion guiding those sensibilities."  Rivera, 331 F.3d at

---

[15] There is some evidence in the record that Maloney occasionally directed offensive language at Bentley.  (See Doc. 17, Tab A at 145, 247.)  Bentley never explains exactly what was said on these occasions or how exactly Maloney "directed" language at her.  And there is no evidence to suggest Maloney was behaving in this fashion because of Bentley's religious beliefs.  Given the totality of the evidence demonstrating Maloney's penchant for crude language, Bentley's allegations that Maloney "directed" offensive language at her is insufficient to establish a hostile work environment.  As the Supreme Court has indicated, Title VII is not intended to impose "a general civility code" upon the workplace.  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  Without pointing to specific instances and describing how Maloney's language in those instances was intended to disparage her religion, Bentley's ambiguous allegations show nothing more than an office atmosphere in which employees crudely addressed other.

190. Bentley presents no evidence to bridge this gap.[16]  Consequently, the court finds Bentley's evidence of hostile working conditions insufficient to establish her prima facie case.  Title VII ensures a workplace free of religious harassment; it does not provide a means by which employees can police the crude but non-discriminatory language of their co-workers.  Thus, summary judgment on this issue will be granted.

### B.   Religious Discrimination

Title VII affords explicit protection to employees from adverse employment actions based upon religion.[17]  See § 2000e-2(a) ("It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any

---

[16] For cases in which plaintiffs have presented sufficient evidence of hostile behavior that occurred *because of* their religion, see EEOC v. WC&M Enters., Inc., 496 F.3d 393 (5th Cir. 2007) (finding in favor of plaintiff, a Muslim born in India, when his co-workers repeatedly referred to him as "Mohammed," "Arab," and "Taliban," and mocked his religiously-based dietary restrictions and daily prayers); Abramson v. William Paterson Coll. of N.J., 260 F.3d 265 (3d Cir. 2001) (finding in favor of plaintiff, an Orthodox Jew, after her superiors continually questioned her observance of Jewish holidays and made comments critical of Orthodox Judaism); Dawson v. Monaco Coach Corp., No. 3:02-CV-830, 2005 WL 3005347 (N.D. Ind. Nov. 9, 2005) (finding in favor of plaintiff, a devout Christian, after his co-workers told him "we don't need your kind around here;" to get his "Christian ass" out of the building; that he was a "Jesus freak;" and after the numerals "666" and a five-point star were etched onto plaintiff's workstation); Weiss v. United States, 595 F. Supp. 1050 (E.D. Va. 1984) (finding in favor of plaintiff, who was Jewish, after his co-workers routinely taunted him with comments such as "resident Jew," "rich Jew," and "Christ killer," among others).  In each of these cases, the plaintiff's religion was the cause of the hostile behavior.

[17] Although the necessary factual evidence is similar, claims asserting religious discrimination are distinct from those alleging the existence of a hostile work environment.  See Abramson, 260 F.3d at 281 n.11.

individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin."). Courts recognize two different theories of religious discrimination: "disparate treatment" and "failure to accommodate." Abramson, 260 F.3d at 281 (citing Chalmers v. Tulon Co. of Richmond, 101 F.3d 1012, 1017 (4th Cir. 1996); Mann v. Frank, 7 F.3d 1365, 1368-70 (8th Cir. 1993)).  In the matter *sub judice*, Bentley's claim is of the disparate treatment variety.  She asserts that once she made her religious views known, her work was "hyper-scrutinized," which ultimately led to her constructive discharge.

In order to satisfy the requirements of a prima facie religious discrimination case, a plaintiff must establish that she was (1) a member of the protected class, (2) that she suffered an adverse employment action, and (3) nonmembers of the protected class were treated more favorably.  Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 318-19 (3d Cir. 2000).  In the event that the plaintiff sufficiently demonstrates the prima facie requirements, the McDonnell Douglas burden-shifting analysis requires the defendant to put forth a legitimate, non-discriminatory reason for its employment decisions.  See Abramson, 260 F.3d at 282; Goosby, 228 F.3d at 319.  Once the employer meets its burden of production, the plaintiff must offer admissible evidence indicating that the employer's reasons were pretextual.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

Bentley claims that the circumstances surrounding her resignation in September 2005 constituted a constructive discharge, thereby establishing an

19

adverse employment action.  She contends that this discharge was precipitated by the religious discrimination that she suffered after relocating full-time to the Harrisburg office in December 2004.

An employee is constructively discharged when an "employer knowingly permits conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."  Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 316 n.4 (3d Cir. 2006) (quoting Gross v. Exxon Office Sys. Co., 747 F.2d 885, 887 (3d Cir. 1984)).  In this context, intolerability "is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign."  Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998) (quoting Blistein v. St. John's Coll., 74 F.3d 1459, 1468 (4th Cir. 1996)).  Proof of constructive discharge requires the plaintiff to show workplace discrimination that is more severe or more pervasive than that which is required to establish a hostile work environment.  See Spencer, 469 F.3d at 316 n.5 (citing Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir. 1992)).

As discussed above, Bentley has failed to marshal evidence sufficient to prove a religiously hostile work environment.  Although this fact does not preclude her religious discrimination claim, it does render it more difficult to show that Harrisburg TV's working conditions were so intolerable that Bentley was forced to resign.  The court finds it beyond dispute that the workplace language used in the Harrisburg TV offices, though crude, was not behavior engaged in because of Bentley's religion.  Thus, to the extent Bentley alleges that her working conditions

20

were intolerable due to language she considered religiously offensive, the court finds her contention unpersuasive.

Aside from the crude office language, Bentley claims her work was "hyper-scrutinized"; presumably, she is referring to the actions surrounding the "sign in/sign out" sheet, the reprimands she suffered because of her work attire, and the directive from management to remove the designation, "senior account executive," from her business correspondence.[18]  The evidence is uncontradicted, however, that Harrisburg TV applied the same "sign in/sign out" policy and work-attire standards to all account executives.  By any objective standard of reasonableness, a workplace where all similarly situated employees must adhere to uniform company policy is not intolerably discriminatory.  Furthermore, although Bentley was required to discontinue her designation as "senior account executive," this requirement was not an actual demotion in position.  Bentley did not lose seniority, nor was her pay decreased.  In fact, Bentley does not dispute Harrisburg TV's contention that

---

[18] The court presumes that these specific incidents comprise the totality of incidents for which Bentley was "hyper-scrutinized" because she has not offered evidence of any other instances in which her work was scrutinized.  Bentley obliquely references the circumstances surrounding her removal from the Pivec advertising account, but it is unclear from Bentley's pleadings whether she claims that this action was the result of religious discrimination.  Even if this allegation constitutes part of Bentley's claim, the record is clear on the reasons underlying Bentley's removal.  Indeed, Bentley admits that she had a "personality" issue with Pivec's manager, Donna Peters, and that Peters wanted Bentley removed from the account.  (See Doc. 17, Tab A at 106.)  Bentley was asked quite specifically during her deposition whether she blamed Harrisburg TV for her removal from the Pivec account, to which she replied, "Oh, no."  (Id.)

"senior account executive" was a nonexistent position in their company structure.[19] It can hardly be said that this incident constitutes an objectively intolerable working condition.  For these reasons, Bentley's constructive discharge claim must fail.

The only other specific incident that the court could arguably construe as one of "hyper-scrutiny" occurred when Saylor questioned Bentley's decision to attend the company cruise along with her boyfriend.  Bentley claims that Saylor questioned her morals in this incident, but did not subject other attendees to similar inquiries.[20]  The court finds that this inquiry, though awkward, was not objectively intolerable.  Saylor spoke to Bentley in private and was not disparaging of her religion.  Furthermore, this encounter constitutes the sole instance in which Bentley links any activity directly to her religious beliefs.  Viewing the totality of the evidence, this single instance does not amount to the level of discrimination necessary to characterize working conditions as intolerable.

---

[19] Bentley merely claims that she was permitted to designate herself as a "senior account executive."  (See Doc. 29 ¶ 5.)  She makes no claim concerning the official existence or nonexistence of the position in the company hierarchy.

[20] Saylor testified that he was merely clarifying with Bentley that each couple would be required to sleep in the same bedroom on the boat.  (Doc. 17, Tab C at 119-22.)  According to Saylor, he was attempting to prevent an embarrassing situation whereby the boat was ready to set sail and Bentley, having discovered the sleeping arrangements on site, became angry that the Harrisburg TV management failed to presume she needed a second room to accommodate her boyfriend, given her religious convictions.  Bentley does not cast doubt on the motivation underlying Saylor's actions; she merely claims that this mind set is illustrative of discrimination.

Moreover, even if Bentley could demonstrate that she suffered an adverse employment action because of religion, her prima facie case is nonetheless inadequate. Bentley carries the burden to show that she was somehow treated differently as a Christian than nonmembers of the class. With respect to the incidents described above, it would be generous to say that Bentley's evidence is woefully lacking. She does not even attempt to prove that Harrisburg TV applied different "sign in/sign out" standards to non-Christians or members of other religions. There is likewise no evidence purporting to show that non-Christians were allowed to dress differently or that non-Christians were permitted to designate themselves "senior account executives." Bentley has not only failed in her prima facie religious discrimination claim, but the record reflects that management treated Bentley just as they treated everyone else. Consequently, the court will grant Harrisburg TV's motion for summary judgment on Bentley's religious discrimination claim.

### C.   Gender Discrimination

Title VII provides employees protection against discrimination perpetrated on the basis of gender. See § 2000e-2(a). The court's analysis of a gender discrimination claim is functionally identical to that required in the religious discrimination inquiry. A plaintiff must first establish a prima facie case, proving that (1) she is a member of a protected class, (2) that she suffered an adverse employment action, and (3) that a nonmember of the protected class was treated more favorably. See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher

<u>Educ.</u>, 470 F.3d 535, 539 (3d Cir. 2006).  Assuming that the plaintiff is able to satisfy these prima facie requirements, the court must then engage in the <u>McDonnell Douglas</u> burden-shifting analysis described above.

Bentley claims that she "was discriminated [sic], in material part, based upon sex (gender) female [sic]."  (Doc. 1 ¶ 81.)  Although the record is composed of several depositions and reams of employment file records, Bentley never even attempts to demonstrate concrete instances of gender bias in the Harrisburg TV offices.  She never once asserts in her deposition that she was treated differently because she is a woman.  Nor did she even attempt to question any of the employees of Harrisburg TV concerning their alleged gender bias.  Instead, Bentley's allegations of gender discrimination appear abandoned and unsupported, as if an afterthought to the remainder of her claim.

In order to prove her gender discrimination claim, Bentley must establish that she suffered an adverse employment action.  <u>See</u> <u>Jones</u>, 198 F.3d at 411. Bentley avers that she was constructively discharged, which requires proof of workplace gender discrimination so intolerable that a reasonable person subject to the same conditions would resign.  <u>See</u> <u>Spencer</u>, 469 F.3d at 316 n.4.  However, Bentley makes no attempt to show that any workplace gender discrimination occurred.  She never alleges that any sexually demeaning comments were uttered, nor does she claim she was treated differently because she is a woman.  Absent any attempt at proving workplace intolerability, Bentley's constructive discharge claim fails.

Even assuming that Bentley could prove that she suffered an adverse employment action, her prima facie case still fails to cross the low threshold required of a plaintiff in this posture.  See Scheidemantle, 470 F.3d at 539 ("[T]here is a low bar for establishing a prima facie case of employment discrimination."). Bentley never alleges that Harrisburg TV treated males more favorably than females, nor could she.  A majority of Harrisburg TV's account executives were female and, as discussed above, the record reveals that management applied the same policies to each account executive, regardless of their gender.  Consequently, the court will grant Harrisburg TV's motion for summary judgment on Bentley's gender discrimination claims.

### D.    Age Discrimination

In language nearly identical to Title VII, the ADEA prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a). Protection under the ADEA is limited to individuals forty years of age or older. § 631(a).  Bentley presents no direct evidence of age discrimination;[21] thus, Bentley's evidence must adhere to the McDonnell Douglas three-step burden-shifting framework described above.  Fakete v. Aetna, Inc., 308 F.3d 335, 337-38 (3d Cir. 2002).  The first step of this framework—proving her prima facie case—requires

---

[21] The Third Circuit has described direct evidence as "evidence that proves an ultimate fact in the case without any process of inference."  Woodson v. Scott Paper Co., 109 F.3d 913, 930 (3d Cir. 1997).  Bentley's proffered evidence does not fall within the ambit of this definition, or anywhere in its vicinity.

Bentley to show that (1) she was over forty years of age, (2) suffered an adverse employment decision, and (3) was ultimately replaced or demoted in favor of a sufficiently younger employee.  See Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 300-01 (3d Cir. 2004); Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001).

In order to prove her claim, Bentley submits that she was fifty-four years old and the oldest account executive on staff on the date of her resignation.  (Doc. 1 ¶ 83(a)-(b)).  She presents no evidence of disparaging remarks regarding her age, health, or ability to perform her job.  She does not even attempt to link any of the alleged instances of "hyper-scrutiny" to age discrimination.  Not only has Bentley failed to raise an inference that younger employees were treated differently, but she has not even directed the court's attention to what she considers an adverse employment action.  As the Supreme Court has noted, "there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a legally mandatory, rebuttable presumption."  O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 311-12 (1996). Bentley has not so much as pointed to the dots that she asks this court to connect. As a result, summary judgment will be granted on the age discrimination claim.

### E.   Retaliation

Bentley's final contention alleges that she was the victim of workplace retaliation.  Under Title VII's antiretaliation provision, an employer is forbidden from "discriminating against any of his employees" because those individuals have

26

"opposed any practice made an unlawful employment practice" by Title VII's anti-discrimination provision.[22]  § 2000e-3(a).  In order to establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.  Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006).

The court finds sufficient evidence to establish Bentley's engagement in protected activity.  An employee engages in protected Title VII activity when she "opposes" workplace activity that Title VII prohibits.  See Slagle v. County of Clarion, 435 F.3d 262, 266 (3d Cir. 2006).  "Opposition" often takes the form of internal workplace complaints highlighting the treatment accorded the plaintiff or other employees.  See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., 450 F.3d 130, 135 (3d Cir. 2006); Slagle, 435 F.3d at 266.  At the time of her opposition, the employee must possess a good faith belief that the practices opposed were unlawful under Title VII.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001); Aman, 85 F.3d at 1085.  So long as a reasonable person would consider the underlying incident unlawful, the actual illegality of the employer's conduct is irrelevant.  See Aman, 85 F.3d at 1085.

---

[22] The ADEA contains virtually identical antiretaliation language.  See 29 U.S.C. § 623(d).

After her permanent relocation to the Harrisburg office, Bentley spoke with her direct supervisor, Maloney, imploring him to cease using language that she found religiously offensive.  When Maloney's behavior did not change, Bentley complained to Lewin and Chambers-Basehore, both of whom held upper management positions.  In this fashion, Bentley followed proper internal channels in lodging her complaint.  Additionally, the court finds Bentley's belief in the illegality of the underlying conduct to have been a reasonable one.  Thus, Bentley engaged in protected Title VII activity according to the first prong in the antiretaliation analysis.

Bentley must next establish that Harrisburg TV took an adverse employment action against her.  In the context of a retaliation inquiry, an adverse employment action constitutes activity that is likely to deter the plaintiff or other employees from engaging in protected Title VII activity.  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006).  The question is whether a reasonable employee would have found the alleged retaliatory actions so "materially adverse" that further complaints of discrimination would effectively be chilled.  Id. at 67-68; Moore, 461 F.3d at 341.  By imposing a "material adversity" requirement, Title VII separates trivial harms from those that are significant, thereby avoiding the establishment of a general "civility code" for the American workplace.  Burlington, 548 U.S. at 68 (citing Oncale, 523 U.S. at 80)).

Bentley's evidence of materially adverse retaliatory action consists of management's application to her of the "sign in/sign out" policy; the reprimands

28

she received for violating company dress code; and the requirement that she cease

designating herself as a "senior account executive."  Not one of these incidents rises

to the level of "material adversity."  In the first two instances, Harrisburg TV was

simply requiring Bentley to abide by the same policies governing the behavior of all

employees.  Even when she was reprimanded, management did not withhold

Bentley's pay or impose any penalties upon her.  Instead, she was simply sent a

memorandum reiterating the policy.  An employer's application of non-

discriminatory company-wide policy is not the type of significant harm Title VII

was meant to guard against.

Bentley's allegations regarding her designation as "senior account executive"

are likewise inadequate.  Although Bentley was required to alter the appearance of

her signature line in emails and business correspondence, Harrisburg TV did not

reduce her pay or rescind any benefits Bentley was currently receiving.  The

reasonable employee might react to this situation with some resentment; but absent

evidence of any additional consequences, the court finds management's action to

fall within the realm of "those petty slights or minor annoyances that often take

place at work and that all employees experience."  <u>Burlington</u>, 548 U.S. at 68.

Viewing the totality of the circumstances, this minor rebuff is simply not enough to

dissuade the reasonable employee from making or supporting a charge of

discrimination.  <u>See</u> <u>Moore</u>, 461 F.3d at 341.

Even if Bentley could establish that one or more of these actions was

materially adverse, she has failed to prove that, in any of the above-described

29

incidents, management acted because of Bentley's complaint.  This third element

requires the plaintiff to demonstrate causation by linking management's

harassment to a retaliatory animus.  See id. at 342; Jensen v. Potter, 435 F.3d 444,

449-50 (3d Cir. 2006).  Again, Bentley does not dispute that when she was

reprimanded, she was reprimanded under company policies applicable to all

account executives; she has presented no evidence that the policies were selectively

enforced.  In fact, there is positive evidence that all account executives were

required to sign in and sign out pursuant to the policy, (see Doc. 17, Tab B at Ex.

34), and the record shows that at least one other employee was reprimanded for

violating Harrisburg TV's dress code, (see Doc. 17, Tab D at 76).  Despite hundreds

of pages of employment files, company emails, and interoffice memoranda, Bentley

can produce no evidence—direct or implied—revealing an intention to treat her

disparately for any reason.[23]

To the extent Bentley rests her retaliation claim on the actions of her co-

workers, as opposed to management, Title VII does not provide liability based upon

the evidence presented.  "An employer may be liable under Title VII for retaliatory

harassment perpetrated by an employee's co-workers only if the *prima facie* case is

satisfied and if there is a basis for employer liability for the co-worker's conduct."

Moore, 461 F.3d at 349 (quoting Jensen, 435 F.3d at 449).  According to Bentley,

after she complained to Lewin and Chambers-Basehore, her co-workers were

unfriendly, some either refused to speak with her or did so sarcastically, and there

was at least one co-worker who refused to sign her birthday card, or share her

---

[23] Bentley avers in her summary judgment affidavit that she was informed of a telephone call between Allbritton and Harrisburg TV management, in which Allbritton's general counsel purportedly advised management to put Bentley "in circumstances and situations where [she] could be characterized as insubordinate and ultimately terminated."  (Doc. 28 ¶ 24.)  Bentley speculates that this strategy explains the reprimands she received in 2005.  Aside from her own averment, Bentley presents no evidence to support this claim.  Moreover, the testimony of Harrisburg TV's management indicates that such a phone call never occurred.  (See Doc. 17, Tab F at 71.)  At this stage of the pleadings, the burden to produce "affirmative evidence, beyond the allegations of the pleadings," rests upon Bentley. See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004). Furthermore, Bentley cannot create a dispute of material fact simply by relying on pure speculation or completely unsubstantiated hearsay.  See Easton v. Bristol-Myers Squibb Co., 289 F. Supp. 2d 604, 613 n.8 (E.D. Pa. 2003); see also Hollander v. Am. Cyanamid Co., 172 F.3d 192 (2d Cir. 1999) (authorizing district court to strike portions of an affidavit based upon inadmissible hearsay); 10B CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2738, at 330-33 (3d ed. 1998) (describing the requirement that affidavits used on summary judgment contain evidence that would be admissible at trial).

birthday cake.  (See Doc. 17, Tab A at 262-63, 271.)  This evidence simply does not rise to the level required to show material adversity.  Rather, Bentley's treatment reveals the type of petty slights for which Title VII does not provide a remedy.  See Jensen, 435 F.3d at 451 ("The statute prohibits severe or pervasive harassment; it does not mandate a happy workplace.").  More importantly, Bentley admits that management had nothing to do with her co-workers' behavior.  (See Doc. 17, Tab A at 271.)  Thus, Bentley's claim fails to establish Harrisburg TV's liability under traditional agency principles.  See Moore, 461 F.3d at 349 ("When co-workers are the perpetrators of the harassment, the plaintiff must prove employer liability using traditional agency principles.").

In sum, Bentley has failed to establish a prima facie case of workplace retaliation.  The court will grant summary judgment to Harrisburg TV on this claim.

## IV.  Conclusion

The summary judgment record shows that several of Harrisburg TV's employees used crude language.  The court does not doubt that the this language offended Bentley's Christian beliefs.  However, no reasonable factfinder could conclude that the language was used because of antipathy toward Bentley's religion.  Moreover, the record is devoid of evidence demonstrating workplace discrimination on the basis of religion, gender, or age.  Finally, although Bentley was reprimanded by management on multiple occasions subsequent to her language complaints, the court finds no evidence that management's actions were

retaliatory.  Accordingly, defendants' motion for summary judgment is granted in

its entirety.

     An appropriate order will issue.


           S/ Christopher C. Conner
         CHRISTOPHER C. CONNER
         United States District Judge


Dated:      November 17, 2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PATRICIA ANN BENTLEY,** | : | **CIVIL ACTION NO. 1:07-CV-0889** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **ALLBRITTON COMMUNICATIONS** | : | |
| **COMPANY, HARRISBURG** | : | |
| **TELEVISION, INC., and WHTM-TV,** | : | |
| **INC., d/b/a WHTM-TV, ABC-27,** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this 17th day of November, 2008, upon consideration of the

defendants' motion for summary judgment (Doc. 15), and for the reasons set forth

in the accompanying memorandum, it is hereby ORDERED that:

1.   The defendants' motion for summary judgment (Doc. 15) is
     GRANTED.  <u>See</u> FED. R. CIV. P. 56(c).

2.   The Clerk of Court is directed to enter JUDGMENT in favor of
     defendants and against plaintiff on all claims.

3.   The Clerk of Court is directed to CLOSE this case.

  S/ Christopher C. Conner  
CHRISTOPHER C. CONNER
United States District Judge
